**UNITED STATES of America,**

v.

**Rocio RAMOS, Defendant.**

**No. Cr. 89–166A.**

United States District Court, W.D. New York.

April 23, 1990.

On Motion for Reconsideration July 26, 1990.

Dennis C. Vacco, U.S. Atty., Thomas Duszkiewicz, Asst. U.S. Atty., Buffalo, N.Y., for U.S.

Herbert Greenman, Buffalo, N.Y., for Rocio Ramos.

## DECISION AND ORDER

ARCARA, District Judge.

Defendant, Rocio Ramos, has moved to suppress all evidence taken and statements made at the time of her arrest on September 19, 1989.

The defendant was observed by Agents Daniel Allman and Paul Terranova of the Airport Task Force,[1] who were assigned to the Buffalo bus terminal, as she disembarked from an express bus arriving from New York City. Agent Allman testified that the express bus is routinely observed by agents concerned with enforcing drug laws because New York City is a known source city for narcotics. He also stated that they had arrested a number of persons who were illegally in this country, after observing them leaving the express bus. The agents had also been advised, approximately six months prior, that drug couriers used this bus frequently, at least in part, because police coverage is reduced at the times the bus leaves and arrives.

The bus left New York City at approximately midnight, and arrived at the Buffa-

lo terminal at approximately 7:10 a.m. The defendant and another passenger left the bus, which was parked at Gate 6, with about 25 to 35 other passengers and proceeded toward Gate 11 or 12. Those gates are the usual location for the bus to Toronto, Ontario, Canada. Both the defendant and her companion were carrying duffel type bags, large enough to hold clothing, and did not pick up any luggage from the underside of the bus. The agents noted that the defendant was nicely, although casually dressed, while her companion wore jeans and a jacket.

At the time the agents first observed the two they were stationed inside the terminal. The defendant and her companion never entered the terminal and the agents continued to observe them through the glass wall of the terminal until their line of sight was blocked by the parked buses.

Agent Allman, a thirteen year veteran of the Border Patrol, found the defendants' conduct in not entering the terminal suspicious, because most passengers enter the terminal to arrange other transportation or to meet someone. He did admit on cross-examination that the majority of persons arrested are stopped inside the terminal. He further testified that he believed the two looked Hispanic because they had light brown skin. Agent Allman testified that he did not know either person, had no knowledge of their addresses, did not know if they were familiar with Buffalo, and could not hear them speaking. Allman decided to follow them and Agent Terranova, alerted by Allman's conduct, also followed.

While Allman proceeded directly out of the terminal and around the buses toward Oak Street, Agent Terranova stopped near Gate 12 where a third Task Force Agent, June Bradley, was assigned. He alerted her that he and Allman had two persons under surveillance. She then proceeded toward the North Division Street side of the terminal in case the two had changed their direction.

---

1. The task force is composed of members of the United States border patrol, the Drug Enforcement Administration, the Erie County Sheriff's Department, the Buffalo Police, the New York State Police and the Transit Authority Police. They are assigned various patrols at the bus, air and railroad terminals.

When she did not see anyone come to that side of the terminal, and did not see the agents, she proceeded toward the Oak Street side of the terminal. On the Oak Street side, she observed Agents Allman and Terranova at a Liberty Cab apparently questioning the occupants of the cab, and she joined the other agents at the cab.

Agent Allman testified that when he approached the cab he identified himself, in English, as a border patrol agent and told the driver he wanted to speak to the two passengers. He asked the driver why he had picked up these passengers at this location, which is on the opposite side of the terminal from the cab stand. The driver told him that he had just dropped off passengers at that point and the defendant and her companion had flagged him down.

Allman testified that when he saw that they had gotten into a cab at a location other than the cab stand, his suspicions of illegal activity were heightened, because he believed that the cab had been prearranged. On cross-examination, he admitted that once he heard the cab driver's story, his suspicion was reduced to his original concern over their citizenship and status in this country. On direct examination, the government had established that as a border patrol agent, his duty on patrol was to be concerned about the citizenship and right to be in the United States of persons he observes. He stated he had been trained to look for certain characteristics, such as appearance, address, kind of luggage, other buses they arranged to take, and their speech.

He then began questioning them. The defendant's companion first stated he was born in Puerto Rico, but shortly thereafter changed his story to indicate that he was born in the Dominican Republic, but was the son of a Puerto Rican. During this questioning he appeared nervous and had trouble catching his breath. But the defendant did not appear anxious and answered without hesitation that she was born in the Dominican Republic but did not have any form of identification on her at that time. Most of this questioning, according to Agent Bradley who was observing and speaks some Spanish, was conducted in Spanish.[2]

Having determined that their status in the United States was in question, Allman directed them to leave the cab and accompany him and the other agents to the Border Patrol office inside the terminal. He testified that once he stopped the cab, they were not free to go, and he held the defendant's companion by the arm on the walk back to the terminal.

Once inside the terminal, Agent Allman took biographical information from both, and placed a call to the Border Patrol Office, asking that the names given by the persons now in his custody be put through the Immigration and Naturalization computer. Neither name was registered in the computer, a process which took at least fifteen minutes.

While Agent Allman was checking the immigration status of the two persons, Agent Bradley asked the defendant if she could look in her bag or bags.[3] Bradley testified that her conversations with the defendant were partly in Spanish and partly in English, although the defendant could speak little, if any, English.

The defendant handed Bradley her purse. The search of her purse revealed identification, which Bradley believed to be false. Without further discussion, Bradley then took the duffel bag, which was on the floor next to the chair where the defendant was sitting, and examined its contents. In the duffel bag she discovered a plastic bag containing a mustard smelling liquid and asked the defendant what was in the bag. The defendant said nothing, but her companion replied it was mataquilla[4] and motioned as if putting cream on his face.

---

2. Agent Terranova did not testify.

3. There is a great deal in the record concerning whether she asked to look in the defendant's bag or bags. The defendant had both the duffel bag and a purse with her.

4. Mataquilla is described as a butter type substance.

Agent Bradley then cut the bag open with a knife and inside found several other plastic bags, the innermost of which contained a white powdery substance. A field test was conducted by Agent Terranova and the powder tested positive for cocaine. After the field test, Agent Allman asked the defendant what was in the bag and she replied cocaine. She also stated that the cocaine belonged to her.

It was not until after all these events had transpired that the defendant was told she was under arrest and read *Miranda* rights in Spanish by Agent Allman. About one-half hour later, she was taken to the offices of the Drug Enforcement Administration and charged with possession with the intent to distribute cocaine.

On September 27, 1989, an indictment was returned charging her with the same crime. Her companion was not charged because he disavowed any knowledge of the cocaine and stated that they were not traveling together, although once alone at DEA headquarters, she stated they were together and he had purchased their tickets.

The primary concern presented by this case is whether the agents acted appropriately under the dictates of the Fourth Amendment when they stopped the taxicab and detained the defendant and her companion. Also raised by the defendant is whether the consent to search her luggage was knowingly and voluntarily given.

The Supreme Court has made clear that the Fourth Amendment requires reasonable suspicion of criminal activity before a person can be stopped, and that it applies to all seizures of a person, even those involving brief detention, which do not constitute an arrest. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person and the Fourth Amendment required that the seizure be 'reasonable'." *United States v. Brignoni–Ponce*, 422 U.S. 873, 876, 878, 95 S.Ct. 2574, 2577, 2578, 45 L.Ed.2d 607 (1975).

In this case, both Agent Allman's testimony and the situation at the cab, as described by both agents, shows that the defendant had been 'seized' within the meaning of the Fourth Amendment.

It is a concern that Allman was primarily focusing on their status as aliens, but in *Brignoni–Ponce*, the Court considered whether the statutory authorization given the Border Patrol to question aliens or persons believed to be aliens about their right to be in the United States (8 U.S.C. § 1357(a)(1)), is sufficient to dispense with the requirement that the officer have some reasonable suspicion, based on articulable facts, to justify stopping a vehicle near the Mexican border to question the occupants about their status in the United States. The only basis the officers had for stopping the car in *Brignoni–Ponce*, and questioning the occupants was that they appeared to be Mexican. The Court held that appearing Mexican,[5] even in fairly close proximity to the Mexican border, was not sufficient to constitute a reasonable suspicion that immigration laws were being violated.

The case now under consideration is very similar. Agent Allman's testimony regarding his concerns about their citizenship is limited to their appearing Hispanic, according to his testimony, because they had light brown skin, and their failure to enter the terminal. This alone is insufficient to establish a reasonable suspicion adequate to justify a stop. *Terry v. Ohio, supra; United States v. Brignoni–Ponce, supra; United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

Keeping in mind that the stop must be supported by articulable facts related to on-going, or about to be committed criminal activity, it cannot be said that having a light brown complexion, and seeking a cab on the street after arriving in a strange city, should alert anyone, even a trained and suspicious officer, that criminal activity was afoot. *Terry v. Ohio, supra.*

But, the Supreme Court has also held that the totality of the circumstances must

---

**5.** It is apparent that appearing Mexican is the functional equivalent of appearing Hispanic.

be evaluated to determine the probability of criminal activity and there must be "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). In *Cortez*, the Supreme Court stated that in considering the totality of the circumstances, the reasonable inferences which can be drawn from those circumstances by a trained officer, should be evaluated to determine if that whole picture gives rise to a "particularized suspicion" of criminal activity by the person stopped and questioned. *United States v. Cortez, supra*, at 418, 101 S.Ct. at 695.

Considering all the evidence in order to determine the totality of the circumstances, the agents relied on four factors before Agents Allman and Terranova stopped the cab and began their questions: (1) that the two persons walking away from the bus appeared Hispanic; (2) that the defendant was dressed better than her companion; (3) that they did not enter the bus terminal but walked around the outside of the terminal and; (4) they were on the express bus from New York City.

These factors, evaluated against the criteria set out in *Terry, Cortez*, and *Brignoni–Ponce*, cannot be said to formulate a reasonable suspicion of criminal activity prior to the time the agents stopped the defendant and her companion in the cab and began questioning them.

■ Although Agent Allman's testimony is unclear, it appears that his primary justification for stopping and questioning them was his concern over their immigration status. The only basis for this was that they looked Hispanic. Looking Hispanic is comparable to looking Mexican, and cannot alone justify a stop for a potential immigration violation. *United States v. Brignoni–Ponce, supra.* More significantly, it cannot then formulate the justification for either a search or questioning not "tied to and justified by the circumstances which rendered its initiation permissible." *Flor-*

*ida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

The other factors (that they did not enter the terminal, that they were dressed somewhat differently, and that they were on the express bus from New York City) do not raise suspicion that they were illegal aliens. If anything, as the testimony developed, these have been factors which may raise suspicion that they were carrying either drugs or money. But even then, evaluating the totality of the circumstances, I do not believe that the agents had sufficient articulable reasons to constitute the reasonable suspicion necessary to stop the defendant and her companion.

This case is somewhat complicated by the fact that Agent Allman testified that his primary concern was their immigration status, but that he had limited authority from DEA to make arrests in drug cases and had training regarding drug courier profiles.[6] The testimony taken, however, despite questioning from the Court, did not establish the officer's basis for making the stop. He testified that he suspected they were illegal aliens while the United States Attorney elicited testimony concerning their possible status as drug couriers. It was only on the Court's own questioning that it was established that the agent was concerned over their Hispanic appearance.

Allman also testified that one of the main factors he considered indicative of criminal activity was that the pair did not enter the bus terminal. That, he stated, along with their looks and the fact that they were disembarking from the express bus from New York City, a known source city for narcotics, indicated the possibility that they were involved with drugs. But the totality of those circumstances does not provide sufficient basis to believe the agents had a reasonable suspicion that criminal activity was a foot. *Terry v. Ohio, supra; United States v. Sokolow, supra.*

It is not unreasonable to find that an express bus, which makes the seven hour

6. Agent Allman did not have the authorization letter he referred to in his testimony with him at the time of the hearing, and it has not been produced by the government.

trip from New York to Buffalo without stops would be preferable to travelers destined for Buffalo, than a longer trip making stops in many upstate towns. The two were not dressed in an unreasonable manner for an overnight trip and carried luggage of the type carried by many travelers on short trips to visit friends. As for the agent's concern that they failed to enter the terminal, it would be just as reasonable to assume that persons unfamiliar with the bus terminal might start looking for a cab on any street rather than entering the terminal.[7]

There is no testimony involving the defendant with large sums of money, false identification, or travel plans which were uniquely short or inconsistent with a social or sightseeing trip. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

It may have been that had the agent overheard them speaking Spanish, his suspicions would be better founded, but until he stopped the cab, he was never in a position to hear either the defendant or her companion speak.

■ Even if there was sufficient basis for the initial stop it would be necessary to suppress the defendant's statements and the cocaine found in her luggage because the government has failed to show that her consent to the search of the duffel bag was knowing and voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The record is unclear whether Agent Bradley asked her for permission to search the luggage after she searched the purse handed over by the defendant. But the government never established that she knew she had the right to refuse the search or that she was given any indication of her rights until after the cocaine was found. The government has the burden of proving that consent was obtained freely and that burden "is not satisfied by showing a mere submission to

a claim of lawful authority." *Florida v. Royer, supra,* and cases cited therein.

As stated in *Royer,* "without a warrant and in the absence of probable cause and exigent circumstances, the validity of the search depended on Royer's purported consent." *Florida v. Royer, supra,* 460 U.S. at 497, 103 S.Ct. at 1323–24. The government, in this case, has failed to show either probable cause or exigent circumstances. The defendant, in her early twenties, offered no resistance and showed no concern about the officers' questions. There is absolutely no reason to believe her bag was searched because the agents were in any way afraid of the defendant. Nor has the government established that any probable cause of a crime which would justify a search of luggage was established.

Based on the totality of the circumstances, the only conclusion that can be reached is that the defendant was stopped because she appears Hispanic and was traveling from a known source city, New York. That alone does not entitle a federal agent to stop a person for questioning and then conduct a search of her personal possessions. *Florida v. Royer, supra.*

## CONCLUSION

For the reasons stated, the defendant's motion to suppress is granted.

SO ORDERED.

## ON MOTION FOR RECONSIDERATION

The government has moved for reconsideration of this Court's order granting the defendant's motion to suppress evidence taken and statements made at the time of her arrest at the Buffalo bus terminal.

The defendant was detained after exiting the express bus from New York City and entering a cab outside the bus terminal. A subsequent search of her luggage revealed a quantity of cocaine. The testimony of the agents established that the defendant was detained at the time they initiated questioning of the defendant and her com-

---

7. Judge John T. Curtin, of this Court, has recently noted in *United States v. Montilla and Colon,* 733 F.Supp. 579, that only three to four arrests resulted from approximately 80 stops made each month of passengers leaving the express bus from New York City.

panion at the taxicab. The primary argument put forth by the government at the time of the suppression hearing and subsequent argument, after briefing, was that the agents had reasonable suspicion as required under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to justify the stop. The government also relied on Agent Allman's suspicions that the defendant was illegally in this country. Given the facts of this case and in light of the Fourth Amendment and the applicable case law, both arguments were found to be insufficient to justify the stop.

The Agent's testimony clearly established that once he and Agent Terranova approached the cab, the defendants were not free to leave. Prior to that time, the testimony and arguments offered simply do not provide adequate basis for a stop.

No new evidence was presented at the time the motion for reconsideration was heard. No argument previously raised and considered now convince this Court that it's initial decision was in error.

On this motion for reconsideration, the government also argues that there was no seizure, but rather an encounter between the defendant and the government agents in which the defendant consented to communicate with Agent Allman. The facts as described in this Court's prior decision belie this description of the events surrounding the stop of the taxicab and the detention of the defendant.

It was after careful consideration of both the testimony offered and the briefing provided that I determined a seizure of the defendant occurred at the taxicab. Even considering the line of cases cited by the government arising out of the D.C. Circuit, there is nothing in this record to demonstrate any consent on the part of this defendant. The agent testified that once he began questioning at the taxicab, the defendant and her companion were not free to leave. There is no evidence to support any theory that this defendant or any reasonable person would have any belief that they were free to leave, once the agents began their questioning.

 Significantly though, the government did not raise the issue of consent at the time of the initial hearing, or at the time of oral argument. It is not appropriate for the government to raise new issues on a motion for reconsideration. Rule 12(f) specifically provides that the failure by either party "to raise defenses or to make requests" constitutes a waiver. The commentary makes clear that this provision applies to both the defendant and the government.

Even if consent could be shown, the government chose not to raise this issue at the time set for the filing of briefs and oral argument. *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). The concept of a consensual exchange between agents of the government and citizens is not new despite the reliance of the United States Attorney on the recent cases of the D.C. Circuit. The government overlooked this argument in the first instance. It chose to proceed on the basis of a valid stop and should not, under Rule 12, be allowed to raise new arguments once it is determined that the stop was not valid.

## CONCLUSION

For the reasons stated, the government's motion for reconsideration is denied and the order of this Court dated April 23, 1990 remains in full force and effect.

SO ORDERED.