**FARM LABOR ORGANIZING COMMITTEE, et al.,**
Plaintiffs,

v.

**The OHIO STATE HIGHWAY PATROL,
et al., Defendants.**

No. 3:96CV7580.

United States District Court,
N.D. Ohio,
Western Division.

Dec. 8, 1997.

William B. Senhauser, John Mark Finnegan, Equal Justice Foundation, Toledo, OH, for plaintiffs.

Allen P. Adler, Office of the Attorney General, Columbus, OH, for defendants.

**Order**

CARR, District Judge.

This is a civil rights case in which plaintiffs seek preliminary relief from allegedly unlawful and unconstitutional practices by defendants. This court has jurisdiction pursuant to 28 U.S.C. § 1331. Pending is plaintiffs' renewed motion for a preliminary injunction. (Doc. 37). Defendants filed a memorandum in opposition (Doc. 47), and plaintiffs filed a reply. (Doc. 49). For the following reasons, plaintiffs' motion shall be granted in part and denied in part.

## Background

Plaintiffs are Hispanic migrant workers who claim that the Ohio State Highway Patrol (OSHP) has violated their constitutional rights by stopping, searching, and detaining them on the basis of race or national origin, interrogating them about their immigration status, and confiscating immigration documents without either justification or providing substitute documents. Plaintiffs seek a preliminary injunction ordering the OSHP to stop these practices. Plaintiffs' earlier motion for a preliminary injunction was denied without prejudice on June 24, 1997, because none of the named plaintiffs had ever been stopped, and therefore no named plaintiff had standing. (Doc. 31). An amended complaint was filed adding plaintiffs Aguilar and Esparza, who have been stopped by the OSHP and questioned about their immigration status and had their immigration documents seized. (Doc. 44).

### A. Standing

■ The first step in the preliminary injunction analysis is standing. To establish standing the plaintiffs must show: 1) injury in fact; 2) traceability; and 3) redressibility. *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir.1996).

■ The injury in fact prong requires that the plaintiff has suffered a concrete or particularized injury that is actual or imminent. *Id.* Plaintiffs are aliens. As such, they possess alien registration receipt cards, also known as "green cards." All aliens over the age of eighteen must at all times have possession of their green cards. 8 U.S.C.

§ 1304(e). An alien failing to possess his or her green card faces a fine of not more than $100 or imprisonment not to exceed thirty days, or both. *Id.*

■ Plaintiffs allege unjustified seizure and retention of green cards by OSHP troopers. If this allegation is proven, defendants have exposed plaintiffs to criminal penalties including possible imprisonment. Thus, if plaintiffs prove an unjustified seizure and retention of green cards, they have shown a concrete particularized injury.[1]

These actions are clearly traceable to the defendant, whose troopers are accused of stopping the plaintiffs, questioning them about immigration status, and confiscating their immigration documents. If issued, an injunction against these practices will clearly redress plaintiffs' grievances. Therefore, plaintiffs meet the three requirements of standing and can proceed with their motion for a preliminary injunction.

### B. Requirements For Injunctive Relief

■ Before issuing a preliminary injunction, a district court must consider:

1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; 2) whether the party seeking the injunction will suffer irreparable harm without the injunction; 3) the probability that granting the injunction will cause substantial harm to others; and 4) whether the public interest is advanced by the issuance of the injunction.

*Dayton Area Visually Impaired Persons v. Fisher*, 70 F.3d 1474, 1480 (6th Cir.1995)

---

1. The parties did not addressed the question of whether return to plaintiffs of their green cards has mooted their demand for preliminary injunctive relief. There are two reasons this action is not mooted by the return of green cards. First, plaintiffs are a class whose claims are not dismissed as moot due to the resolution of the class representative's claims. *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), ("the issue sought to be litigated escapes full appellate review at the behest of any single challenger, does not inexorably become moot by the intervening resolution of the controversy as to the named plaintiffs,"). Second, even if this were an individual action it would not be mooted because this is a situation that is capable of repetition but evasive of judicial review and redress. Where the facts that are the basis of the litigation expire

before judicial review, but are capable of repetition, there is a live controversy. *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911), *Roe v. Wade*, 410 U.S. 113, 124–25, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In *United States v. New York Tel. Co.*, 434 U.S. 159, 165, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), the Supreme Court found a live controversy where the judicial order that was the basis for the suit had expired. Because such orders would always expire before judicial review, and the challenged practice could be repeated, the controversy was not moot. Here, the OSHP could continue to seize green cards unlawfully, subjecting the victims to potential criminal penalties, and yet avoid legal redress by returning the green cards before trial.

(*citing Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994)). Those four considerations are "factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Thus, "[n]ot all of these factors fully need to be established for an injunction to be proper," and no single factor is to be "given controlling weight." *Michigan State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). *Accord, Blue Cross & Blue Shield Mutual of Ohio v. Columbia/HCA Healthcare et al.*, 110 F.3d 318, 334 (6th Cir.1997) ("none of the four factors is to be deemed conclusive on its own [and] each need not be viewed in isolation from the others, solely as an independent variable").

 One aspect of the analysis is certain: a preliminary injunction shall not issue where there is no likelihood of success on the merits. *Sandison v. Michigan High School Athletic Association*, 64 F.3d 1026, 1037 (6th Cir.1995). The certitude of success on the merits need not, however, be absolute. The Sixth Circuit recognizes that a preliminary injunction may be granted where the moving party only shows "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 103 (6th Cir.1982) (*quoting Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250 (2nd Cir.1973)). As detailed below, I conclude there are "sufficiently serious questions going to the merits" of plaintiffs' allegations and a balance of hardships "tipping decidedly" toward plaintiffs.

**1. Likelihood of Success on the Merits**

**a. The Fourth Amendment Applies to this Situation**

 A threshold question is whether the Fourth Amendment applies to the case at bar. I have little difficulty in concluding that it does. The Fourth Amendment, which applies to citizens and aliens alike, *Almeida–Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), protects the "right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures." U.S. Const. amend. IV. State officials must comply with the Fourth Amendment when discharging their official duties; thus, OSHP troopers must act in a manner and under circumstances compatible with the Fourth Amendment.

 As its language expressly indicates, the Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). The Fourth Amendment does not bar all contact between the police and citizenry. It does, however, "prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Although "searches and seizures [must] be founded upon an objective justification," no such justification is required where there has been neither a search nor a seizure. *United States v. Mendenhall*, 446 U.S. 544, 551, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). As stated in *Mendenhall*:

> As long as a person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification . . . We conclude that a person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

*Id.* 446 U.S. at 553–54. An officer "seizes" an individual only where the officer impairs the individual's right to leave. When a seizure occurs, the Fourth Amendment requires that the seizure have been reasonable. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

 Moreover, even though a seizure was lawful, it can become unlawful by becoming unreasonably intrusive or prolonged. The scope and duration of a seizure must reasonably relate to the underlying justifica-

tion for the seizure. Once that justification expires, the seizure must end. As stated by the Supreme Court in *Terry*, 392 U.S. at 19–20, "in determining whether the seizure and search were 'unreasonable' [the] inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Thus, "the scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation possible." *Id.* 392 U.S. at 19. An officer must confine his or her investigation "strictly to what was minimally necessary" to achieve the justified, proper objective. *Id.* at 30. *See also Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (officer's search must be "tied to and justified by the circumstances which rendered its initiation possible").

In light of the foregoing, the traffic stops giving rise to this lawsuit indisputably were seizures under the Fourth Amendment. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (traffic stops implicate the Fourth Amendment). Even if the stops complied with the Fourth Amendment, the officers' subsequent activities must also have met Fourth Amendment requirements: *i.e.*, those further actions must have reasonably been related to the purpose—to enforce Ohio's traffic laws—of the stop. *Terry*, 392 U.S. at 30.

### b. Stopping, Detaining, and Searching Motorists Based on Hispanic Origin or Appearance

The first issue—whether the officer was justified in stopping the plaintiffs' vehicle—asks if "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.* 392 U.S. at 21–22. "Anything less," the Court stated in *Terry*, "would invite intrusions on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Id.* Thus "in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to

the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 27. Reasonableness, in all cases, must be measured by an objective standard, not by the subjective impressions of the particular officer. *Delaware v. Prouse*, 440 U.S. 648, 654–55, 99 S.Ct. 1391, 1396–97, 59 L.Ed.2d 660 (1979).

There can be no question that a seizure based solely on race or ethnicity can never be reasonable. In *Brignoni–Ponce*, 422 U.S. at 884, the Supreme Court, curtailing the authority of federal agents to engage in questioning and searches of potentially illegal immigrants, declared that officers may stop vehicles "only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally within the country." *Id.* In other words, an officer must have "particularized suspicion" before he or she stops, detains, and questions a potential illegal alien. In finding the officers' actions in *Brignoni–Ponce* unconstitutional, the Supreme Court stated:

> In this case the officers relied on a single factor to justify stopping respondents' car: the apparent Mexican ancestry of the occupants. We cannot conclude that this furnished reasonable grounds to believe that the three occupants were aliens. At best the officers had only a fleeting glimpse of the persons in the moving car, illuminated by headlights. Even if they saw enough to think the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who are illegally in the country. Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens. The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens.

*Id.* at 885–87. *See also Murillo v. Muse-gades,* 809 F.Supp. 487, 499 (W.D.Tex.1992); *United States v. Ramos,* 753 F.Supp. 75, 79–80 (W.D.N.Y.1990); *Ramirez,* 599 F.Supp. at 1283. As recently stated by the Sixth Circuit in a case involving seizure of an airline passenger:

> citizens are entitled to equal protection of the laws at all times. If law enforcement adopts a policy, employs a practice, or in a given situation takes steps to imitate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred.

*United State v. Avery,* 128 F.3d 974, 985 (6th Cir.1997).

In the case at bar, if defendants stopped the plaintiffs' vehicle for violations of motor vehicle laws, the stop was "reasonable" and thus not violative of the Fourth Amendment. If, however, the stop was made because of "inarticulate hunches" based solely on plaintiffs' Hispanic appearance, then the stop was unreasonable, and violated the Fourth Amendment.

▪ Defendants claim that the plaintiffs were pulled over because Aguilar's car had a burned out headlight. (Doc. 47 at 3). Plaintiffs admit that they were stopped for a malfunctioning parking light. (Doc. 49 at 11). Therefore, plaintiffs do not dispute that there is an objective basis for the initial stop. Under *United States v. Ferguson,* 8 F.3d 385, 391 (6th Cir.1993), a traffic stop is lawful, regardless of any subjective motivation on the officer's part, if the stop has an objectively lawful basis under the applicable traffic laws. Because there is no dispute that the initial stop of plaintiffs was reasonable under this standard, plaintiffs have presented insufficient proof of a substantial likelihood of success on the merits of their claim of initial stops based on ethnicity.

### c. Questioning As To Immigration Status

The plaintiffs Aguilar and Esparza challenge defendants' questioning of them about their immigration status. An initial question is whether *state* officers can ask questions about a person's status under *federal* immigration laws.

▪ The federal government possesses exclusive power to regulate immigration. *DeCanas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). *See also Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909) ("Over no conceivable subject is the power of Congress more complete than it is over the admission of aliens"). Congress has exercised its constitutional authority to regulate immigration by enacting the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq. The INA and its accompanying regulations comprehensively address issues relating to immigration, including authorized entry, length of stay, residence status, and deportation. The INA, furthermore, delegates enforcement duties to the Immigration and Naturalization Service (INS). No state can add to or reduce the force of immigration regulations enacted by Congress. *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 419, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948).

▪ In light of the preemptive reach of federal authority over immigration, the states, at least arguably, have no interest in, and thus no role to play in the enforcement of federal laws relating to aliens. As a general rule, however, local police are not precluded from enforcing federal statutes. *Gonzales v. City of Peoria,* 722 F.2d 468, 474 (9th Cir.1983). Thus, where state enforcement activities do not impair federal regulatory interests, concurrent enforcement activity by local and federal enforcement authorities is authorized. *Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

These general doctrines about the enforceability of federal law by local police were applied to immigration laws in *Gonzales.* In that case the Ninth Circuit concluded that "nothing in federal law precluded [local] police from enforcing the criminal provisions of the Immigration and Naturalization Act [and] Arizona law authorizes local officers to arrest for violations" of the Act. 722 F.2d at 477. In reaching its conclusion that local police could enforce federal immigration

laws, the Court in *Gonzales* examined whether: 1) federal law precluded concurrent enforcement by state officers of federal criminal immigration laws, and 2) state law affirmatively authorized local law enforcement officials to enforce federal immigration laws.

In *Gonzales,* the court determined that the Arizona legislature authorized police authorities in that state to enforce criminal provisions of the federal immigration laws. Arizona's peace officers are authorized to make warrantless misdemeanor arrests. Federal immigration laws include misdemeanors.[2] Because Arizona peace officers can make misdemeanor arrests, the court in *Gonzales* concluded that Arizona peace officers could make misdemeanor arrests based on violations of criminal provisions of the federal immigration laws. 722 F.2d at 476.

■ I agree with the court in *Gonzales* that federal law does not preclude local or state enforcement of the penal provisions of the INA. As stated in *Gonzales,* the INA does not evidence "an intent to preclude local enforcement of the Act's criminal provisions." *Id.* at 474. Likewise, it cannot be inferred that "the federal government has occupied the field of criminal immigration enforcement" to the exclusion of local and state authorities. *Id.* at 474–75.

■ Moreover, the explicit language of § 1324(c) of the INA leaves open the possibility of local or state assistance in the enforcement of federal immigration laws: "[n]o officer or person shall have authority to make any arrest for a violation of any provision of this section except officers and em-

ployees of the Service designated by the Attorney General, ... and all other officers whose duty it is to enforce criminal laws." Thus, any officer, including officers of the OSHP, "whose duty it is to enforce criminal laws" may, consistent with the doctrine of preemption, enforce the criminal prohibitions of the INA.

■ In Ohio, officers of the OSHP are peace officers under O.R.C. § 2935.01(B). " 'Peace officer' includes a sheriff, deputy sheriff, marshal, ... [and] the superintendent and troopers of the state highway patrol." OSBP troopers are authorized to enforce criminal laws on state property. O.R.C. § 5503.02. This also applies to the turnpike. O.R.C. § 5503.31. An offense is defined in O.R.C. § 2935.01(D) as including, "felonies, misdemeanors, and violations of ordinances of municipal corporations and other public bodies authorized by law to adopt penal regulations." Therefore, OSHP troopers are authorized by Ohio law to enforce the criminal provisions of federal immigration law. This, in turn, means that state officers can, at least in some circumstances, question motorists about their alienage and immigration status.

■ The constitutionality of such questions to motor vehicle occupants and drivers depends on the second *Terry* inquiry: namely, whether such investigation is "reasonably related in scope to the justification for [its] initiation" or "reasonably designed" to meet the objectives which justified the interference in the first place. *Terry,* 392 U.S. at 29. In the context of this case, this means that the intrusiveness (*i.e.,* questions about alienage

---

**2.** The pertinent provisions of the federal immigration laws are located at 8 U.S.C. § 1324(c) (penalties for document fraud) and § 1325 (improper entry by aliens). Defendants also claim authority to enforce 18 U.S.C. § 1028(a)(6) (possession of stolen identification documents), 18 U.S.C. § 1426 (reproduction of naturalization or citizenship papers), 18 U.S.C. § 1546 (fraud and misuse of visas, permits, and other entry documents), and O.R.C. § 2913.31 (forgery).

Under federal law, any offense punishable by more than one year in prison is classified as a felony while any offense punishable by less than one year is either a misdemeanor or infraction. 18 U.S.C. § 3559. A violation of § 1324(c) subjects an individual to a cease and desist order

along with a civil money penalty. Section 1325, improper entry by an alien first-time offender, is a misdemeanor that occurs at the time of illegal entry. *See United States v. Rincon–Jimenez,* 595 F.2d 1192, 1193–94 (9th Cir.1979).

Violations of 18 U.S.C. § 1028(a)(6) range from felonies to misdemeanors depending on the extent of the fraud. The penalty for violating § 1426 is a fine of not more than $5,000 or imprisonment for not more than five years, or both. A transgression of § 1546 is also a felony, punishable by a fine of up to $2,000 or imprisonment of not more than five years, or both. There are varying degrees of felonies for violating the Ohio forgery statute, O.R.C. § 2913.31, but all violations are felonies.

or immigration status) and duration of the stop must bear a reasonable relation to either the underlying traffic offense or other circumstances that come lawfully to the officers' attention during the stop. *See United States v. Mesa*, 62 F.3d 159, 161–62 (6th Cir.1995) (search following a traffic stop improper absent reasonable suspicion for further questioning or investigation; "[o]nce the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention").

An example of how an investigation must be reasonably related in scope to the justification for the initial stop appears in *U.S. v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). There the Supreme Court held that due to the difficulty of policing the Mexican–United States border, a brief stop and investigation for illegal aliens was justified. *Id.* 422 U.S. at 881. The investigation was limited to the circumstances that led to the stop, *i.e.*, a suspicion that the car contained illegal aliens:

> As in *Terry*, the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' 392 U.S. at 29, 88 S.Ct. at 1884. The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.

*Id.* at 881–82. Because the initial stop was to check for illegal aliens, inquiries about citizenship were justified.

■ Plaintiffs Aguilar and Esparza were detained for a traffic violation. An inquiry by the OSHP as to an individual's immigration status cannot be "reasonably de-signed" to meet the objectives of a traffic stop or "strictly tied to and justified by" the circumstances that led to the stop and ensuing seizure. Therefore, detention beyond the time needed to issue a warning or citation for a malfunctioning light, must be based on articulable facts giving rise to reasonable suspicion. *Mesa*, 62 F.3d at 162.[3]

■ In the context of a conventional traffic stop, therefore, any inquiry about alienage or immigration status must be based on either reasonable suspicion about such status or the occupants' consent. In the instant case, there has been no showing that the officers had reasonable suspicion or cause, aside from the plaintiffs' Hispanic appearance,[4] to believe that they may have been aliens. The police report, attached as defendants' exhibit A, shows that the plaintiffs had an Illinois driver's license and an Illinois identification card. (Doc. 47, exh. A). This proves that plaintiffs did not have to produce their green cards as their only form of identification. There is no other evidence in the record or argument by defendants as to the specific facts creating reasonable suspicion for questioning about immigration status.

At some point during the encounter, the drug detection dog "alerted." The record is not clear on the question of whether the alert occurred before or after the inquiry about immigration status and seizure of the green cards. I conclude that it is more likely than not that the alert came after, rather than before such inquiry and seizure because there is no indication in the record that the plaintiffs were told they were under arrest before the green cards were taken from them. Had the dog already alerted, it is highly likely that the officers would have focused on the apparent presence of drugs, rather than taking the time to ask about immigration status and seize the green cards.

---

**3.** Officers may also run a computer check on the driver's license, and the vehicle registration. *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir.1996). However, once the license and registration check is complete and the citation is written, any further detention or questioning must be based on a reasonable suspicion or consent. *Mesa, supra.*

**4.** Once the activities incident to the traffic stop had been completed, any further detention of the plaintiffs that was motivated by a desire, based solely on their Hispanic ethnicity, to question them about their immigration status was unlawful under the Equal Protection Clause. *See Avery*, 128 F.3d at 978.

■ Defendants, apparently aware of the lack of any other basis for questioning the plaintiffs about their immigration status, contend that plaintiffs consented to such questioning and, ultimately, seizure of their green cards, which, defendants assert, were voluntarily supplied as a means of identification. (Doc. 47 at 3). When a law enforcement activity is conducted pursuant to valid consent, no claim can be made that a Fourth Amendment violation has occurred. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *Accord, Terry*, 392 U.S. at 16 (when a person voluntarily cooperates with a law enforcement officer, that individual is in no meaningful way detained and no seizure occurs for Fourth Amendment purposes).

■ Where the validity of a search rests on consent, the state has the burden of proving that the necessary consent was obtained and that such consent was freely and voluntarily given. This burden is not satisfied by merely showing submission to a claim of lawful authority. *Royer*, 460 U.S. at 497; *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 329, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). As stated by the Supreme Court: "the Fourth and Fourteenth Amendments require [that the government] demonstrate that the consent was in fact voluntarily given and not the result of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 248–49. In addition, according to the Supreme Court:

> while most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.

*INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

Plaintiffs raise a serious challenge to the alleged consensual nature of defendants' questions to them about their immigration status and production of their green cards. Being stopped for a minor traffic offense and given a ticket or warning is one thing; being questioned in a forceful tone by several officers, one of whom has arrived on the scene with a drug-sniffing canine, is quite another. Plaintiffs have shown a substantial likelihood of success on the issue of lack of consent. In sum, with regard to defendants' practice of questioning motorists about their immigration status, plaintiffs have raised "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Friendship Materials Inc.*, 679 F.2d at 103.

#### d. Confiscation of Immigration Documents

Finally, plaintiffs challenge defendants' occasional practice of confiscating green cards. On registering with the INS and providing certain personal information and fingerprints, a legal alien is issued "a certificate of alien registration or an alien registration receipt card." 8 U.S.C. § 1304(d); 8 C.F.R. § 264.1. These documents provide legal aliens with proof of their alien registration and legal status.

Green cards play a significant role in the day-to-day lives of legal aliens. All legal aliens over the age of eighteen are required to carry their green card at all times and failure to do so is a misdemeanor. 8 U.S.C. § 1304(e). Furthermore, a green card is a preferred way to procure other important forms of identification (*i.e.*, a social security card or driver's license) and establish eligibility for a variety of governmental programs, including Medicaid, unemployment compensation, food stamps, and aid to families with dependent children. *Etuk v. Slattery*, 936 F.2d 1433, 1437 (2nd Cir.1991); *Etuk v. Blackman*, 748 F.Supp. 990, 992 (E.D.N.Y. 1990). Finally, and perhaps most importantly, a legal alien can use his or her green card to establish eligibility to work. *Id. See also Blackman*, 748 F.Supp. at 992.

■ Because the green card is "the most widely utilized and accepted means of proving [legal alien] status," which in turn enables lawfully admitted aliens to provide for themselves and their dependents, the Second Circuit held in *Etuk v. Slattery* that the

federal immigration laws require the INS to provide temporary proof of legal status to aliens whose green cards· have been· seized. 936 F.2d at 1448. I agree ·with· the analysis and conclusion in *Slattery* that federal law grants legal aliens the right to possess suitable permanent or temporary documentation by which to prove their legal status after a green card has been seized.

If the INS cannot confiscate a green card without · providing a temporary substitute, neither can the OSHP. Just as federal agents "cannot completely interfere with a [legal alien's] ability to earn a living and provide for himself or family," *Slattery*, 936 F.2d at 1447, so too the OSBP cannot interfere so completely with such ability under federal law.[5]

Plaintiff Aguilar stated in his affidavit that Trooper Kiefer demanded his green card while he was locked in the back seat of the police cruiser. (Doc. 37, Exh. 1). Plaintiff Esparza stated in her affidavit that a trooper grabbed her wallet and dug through it until he found her green card. (Doc. 37, Exh. 2). Defendants admit confiscating immigration documents in their response. (Doc. 47). Thus, the admitted confiscation by defendants of certain immigration documents, in my view, raises substantial concerns as to which plaintiffs are likely to prevail. Thus, in addition to defendants' practice of questioning motorists about their immigration status, the confiscation of immigration-related documents is a "fair ground" for litigation. *Friendship Materials, Inc.*, 679 F.2d at 103.

## 2. Possibility of Irreparable Harm to the Plaintiffs

 There can be no dispute that the violation of an individual's Fourth Amendment rights is a serious ·injury, especially where the violation leads to confiscation of critical documents that, by law, a legal alien is required to carry under penalty of detention, fine, or even imprisonment. Violations of the Fourth Amendment constitute irreparable harm sufficient to justify injunctive relief. *Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1983). Thus, as to defendants' immigration-related activities, the second prong of the preliminary injunction test is easily satisfied.

## 3. Probability That Injunction Will Harm Others

No showing has been made that issuance of a preliminary injunction against defendants' immigration-related activities would cause substantial harm to others. Defendants have failed to express with any degree of specificity how the proposed injunction will hinder their ability to enforce the laws of Ohio or obstruct drug interdiction on Ohio highways. Because defendants are not authorized to seize green cards without supplying substitute identification, an injunction would not impede them from exercising the full breadth of their lawful authority.

A preliminary injunction against defendants' immigration-related activities would not require the OSHP to undertake any affirmative act, be it instituting new training procedures or promulgating new rules. A preliminary injunction would not significantly regulate the internal operations of the OSHP: it merely would require defendants to act in accordance with the dictates of the Fourth Amendment. Preliminary injunctive relief would serve as a prophylaxis against unconstitutional treatment of Hispanics using Ohio highways. Therefore, the third prong of the preliminary injunction test is satisfied. Taken together, at this point in the litigation, I am persuaded that the balance of hardships tips decidedly toward plaintiffs.

## 4. Advancement of the Public Interest

Finally, guarding against violations of the Fourth Amendment and federal law serves the public interest. In issuing this preliminary order, I recognize that critical interests

---

5. I note that plaintiffs seek to represent a class of migrant workers. This colloquial description suggests the importance of green cards to the plaintiffs and members of the putative class. To get and to get to work a migrant laborer. necessarily must travel freely and be able to show his or her green card to farmers in whose fields he or she will be working. Employers must verify that everyone they hire is not an illegal alien 8 U.S.C. § 1324a(b)(1)(A–D). This is accomplished by checking the employee's identification documents. Employers who fail to confirm an alien employee's legal status expose themselves to legal penalties. 8 U.S.C. § 1324a(f). Without a green card, an alien migrant worker cannot secure lawful employment from a law abiding employer.

are served by state officers zealously enforcing criminal laws, be they state or federal criminal laws, and protecting the public. However, the OSHP may not detain drivers on the basis of ethnicity alone, *see Avery, supra*, and the OSHP lacks authority to seize green cards without supplying substitute identification. Therefore, I believe that the public interest would be served by enjoining such practices.

### Conclusion

I am mindful that fundamental principles of federalism restrict the power of a United States court to interfere with or impinge on the internal affairs of a state agency and the administration of state law. *Rizzo v. Goode*, 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *O'Shea v. Littleton*, 414 U.S. 488, 500, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Furthermore, I recognize that relief against law enforcement authority "must not be granted lightly, for unduly obtrusive or hasty judicial intervention can undermine the important values of police self-restraint and self-respect." *Long v. District of Columbia*, 469 F.2d 927, 932 (D.C.Cir.1972). In the course of briefing, defendants, however, have failed to express with any degree of specificity how they justify on constitutional and legal grounds their inquiries concerning alienage and immigration status, much less their seizure of green cards without supplying appropriate substitutes. Further, defendants fail to address how the proposed relief would harm the OSHP, other persons or entities, or the public interest. The requested injunction appears unlikely to impede the defendants from exercising the full breadth of their lawful authority.

I find that plaintiffs have shown a substantial likelihood of success on the merits of their claims concerning questioning about immigration status and seizure of immigration documents, but have not shown such likelihood with regard to their claim of stops based on ethnicity. In addition, the other three parts of the preliminary injunction analysis weigh in plaintiffs' favor. Plaintiffs also show that the balance of the hardships tips decidedly in their favor.

I do not, however, believe that I can enjoin the OSHP absolutely from all questioning as to immigration status. Such questioning is proper if, on the basis of objective, articulable facts, it bears a reasonable relationship to the circumstances of the initial seizure, there is reasonable suspicion that motorists are in violation of immigration laws, or the motorists have given uncoerced consent to such questioning. The OSHP can, however, be enjoined from questioning about immigration status when those circumstances do not exist. In any event, I perceive no basis in the present record for not enjoining the practice of seizing green cards without lawful cause and supplying appropriate substitute documents.

Therefore, it is

**ORDERED THAT** plaintiffs' renewed motion for a preliminary injunction, (Doc. 37), be and hereby is,

1) Denied as to their claim of stops based on ethnicity;

2) Granted as follows with regard to questioning about immigration status and seizure of immigration documents:

A) The officers, agents, and employees of the Ohio State Highway Patrol are enjoined from questioning motorists about their immigration status 1) without reasonable suspicion based on articulable objective facts arising either a) from the circumstances of the initial seizure of motorists or b) other circumstances arising during such seizure that such motorists are in violation of federal law relating to immigration, or 2) uncoerced and otherwise lawful consent to such questioning; and B) The officers, agents, and employees of the Ohio State Highway Patrol are enjoined from seizing immigration documents from motorists absent lawful cause for doing so and, if such seizure occurs, providing forthwith fully effective substitute documents.

**So ordered.**