**UNITED STATES of America,**
**Plaintiff,**

v.

**Manuel RODRIGUEZ–ARREOLA,**
**Defendant.**

**No. CR 00–40071.**

United States District Court,
D. South Dakota,
Southern Division.

Dec. 22, 2000.

Michelle G. Tapken, U.S. Attorney's Office, Sioux Falls, SD, for Plaintiff.

Julie L. Irvine, Federal Public Defender's Office, Sioux Falls, SD, Jana M. Miner, Federal Public Defender's Office, Pierre, SD, for Defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

Defendant, Manuel Rodriguez–Arreola, is charged with illegal re-entry after deportation, a violation of 8 U.S.C. § 1326(a). Defendant is also subject to a sentencing enhancement under 8 U.S.C. § 1326(b)(2) for having been convicted of an aggravated felony prior to deportation. Before trial, Defendant filed a Motion to Suppress all evidence and statements obtained as a result of his encounter with an officer of the South Dakota Highway Patrol. Magistrate Judge John E. Simko filed a Report and Recommendation that the Motion be granted, and the Government timely filed objections. For the reasons stated below, the Court adopts the Report and Recommendation, with slight modifications, and grants the Motion to Suppress.

## BACKGROUND

On September 14, 2000, Defendant was a passenger in car driven by Estaban Molina, which was stopped for speeding by South Dakota Highway Patrolman Chris Koltz. As described more fully in the Magistrate Judge's Report and Recommendation, Trooper Koltz questioned Molina, and then questioned Defendant. After questioning both men, Trooper Koltz had Molina and Defendant stand in a ditch beside the road, while a drug dog sniffed Molina's car. Trooper Koltz next contacted the INS Command Center in Chicago, and Defendant talked to an INS agent. After this conversation, the INS agent told Trooper Koltz to detain Defendant and take him to the nearest jail. Molina was given a speeding ticket and allowed to leave.

## THE GOVERNMENT'S OBJECTIONS

The Government has filed the following three factual objections to the Magistrate Judge's Report and Recommendation:

(1) The Magistrate failed to note that Trooper Koltz noted that the vehicle had tinted windows.

(2) The Magistrate failed to note that Molina (the driver) had previously told Trooper Koltz that Defendant did not have a green card and was not a legal alien.

(3) The Magistrate made a finding that the defendant was detained because of his race, when the Defendant was detained because the Immigration and Naturalization Service (INS) determined that he was an aggravated felon.

The Government also objects to the Magistrate Judge's legal conclusions that the stop of Defendant violated his rights under the Fourth Amendment and *Miranda v. Arizona,* and that evidence obtained as a result of that stop must be suppressed.

## DISCUSSION

Upon the filing of objections to a magistrate judge's report and recommendation, a judge of the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The first two factual objections raised by the Government are supported by the record, and are granted by the Court. The Magistrate Judge's findings of fact are modified to add that Trooper Koltz noticed that Molina's car had tinted windows, and that, prior to Koltz's questioning of Defendant, Molina told trooper Koltz that Defendant did not have a green card and was not a legal alien. (Having viewed the videotape of this stop, the Court also notes that the tint in the car windows was light, and

allowed objects inside the vehicle to be seen from the outside.) For the reasons stated below, however, the addition of this information does not affect the validity of the Magistrate Judge's legal recommendations.

The Government's third objection—to the finding that Defendant was detained because of his race—is overruled. The Magistrate Judge's finding refers to the initial detention of Defendant, and thus is not affected by the fact that Officer Koltz eventually let Molina go.

■ The Government suggests that Trooper Koltz's observation of tinted windows on Molina's car provided an additional reason for him to detain the vehicle, and to question Defendant. The Court assumes, for the sake of argument, that some types of tinted windows might under certain circumstances contribute to reasonable suspicion that certain types of criminal activity are afoot. It should be noted that almost all vehicles have windows that are tinted to some degree. There is no sound reason, however for concluding that the presence of tinted windows on Molina's car supported a reasonable suspicion that Defendant was an illegal alien. Without such a suspicion, there was no basis for Trooper Koltz to expand the traffic stop to ask either Molina or Defendant about Defendant's alienage.

The Government also argues that, because Trooper Koltz had already been told by Molina that Defendant was in the country illegally, the subsequent stop and questioning of Defendant was permissible. Trooper Koltz, however, only obtained this information from Molina by first impermissibly expanding the scope of his questioning from Molina's driver's license, registration, destination and purpose to whether Molina and Defendant were illegal aliens. (Report and Recommendation, Ex. A.) As explained by Magistrate Judge Simko, information gleaned from these questions could not provide a reasonable suspicion to stop and question Defendant. (Id. at 12–13.) *See United States v. Restrepo*, 890 F.Supp. 180 (E.D.N.Y.1995).

■ In its objections, the Government states that Trooper Koltz did not violate *Miranda* because Defendant "was free to go until the INS told Trooper Koltz that [Defendant] should be held because he was an aggravated felon." From the videotape, it is clear that Defendant was not free to go. Trooper Koltz instructed him to stand in beside the highway, had a drug dog sniff Molina's car, and, for a substantial amount of time, took possession of the car keys. Defendant was not going anywhere until Trooper Koltz heard back from the INS.

■ Finally, the Government argues that, even if Trooper Koltz's questioning violated Defendant's rights under the Fourth Amendment and *Miranda v. Arizona*, the evidence of Defendant's identity obtained as a result of those questions cannot be excluded from Defendant's trial. *See United States v. Guzman–Bruno*, 27 F.3d 420, 421–22 (9th Cir.1994) (holding that a defendant's identity cannot be suppressed). Acceptance of the Government's argument would leave no real remedy for violations of Fourth Amendment rights in the realm of suspected immigration offenses. As noted in a previous decision of this Court, such a result contradicts the Supreme Court's statement that Congress "cannot diminish the Fourth Amendment rights of citizens who might be mistaken for aliens," and renders legal aliens and even citizens subject to abuse at the hands of law enforcement. *See United States v. Mendoza–Carrillo*, 107 F.Supp.2d 1098, 1107 (D.S.D.2000) (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975)). Based on these considerations, this Court held in *Mendoza–Carrillo* that evidence

resulting from the illegal detention of an alien can be suppressed at his criminal trial. *See id.* The Court declines the Government's invitation to reconsider its holding.

IT IS ORDERED:

(1) that, subject to the modifications mentioned above, the Magistrate Judge's Report and Recommendation is adopted; and

(2) that the Motion to Suppress (Docket No. 12) is granted.

## REPORT AND RECOMMENDATION

SIMKO, United States Magistrate Judge.

This matter is before the court on Defendant's Motion to Suppress (Doc. 12). A hearing on the motion was held on Monday, November 6, 2000. Plaintiff was represented by its counsel of record, Assistant United States Attorney Michelle Tapken. Defendant appeared in person and was represented by his counsel of record, Julie Irvine. The court has reviewed the Defendant's motion and brief, the brief of the United States, and listened carefully to the testimony of the witnesses and arguments of counsel, as well as reviewed a videotape [1] of the incident. Based upon that review the court makes the following:

### *RECOMMENDATION*

Based upon the Facts and Discussion below, the Court recommends that the Defendant's Motion to Suppress be **GRANTED.**

### *JURISDICTION*

This criminal proceeding is before the Court pursuant to an Indictment charging the Defendant, Manuel Rodriguez–Arreola, with illegal re-entry in violation of 8 U.S.C.

§ 1326(a). The Defendant's Motion to Suppress was referred to the Magistrate Judge for a Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b)(1)(B).

### *FACTUAL BACKGROUND*

On September 14, 2000 at approximately 1:42 p.m., South Dakota Highway Patrolman Chris Koltz initiated a traffic stop for speeding on a vehicle driven by Esteban Molina (hereinafter "Molina".) (TR 7–9; 44–45.) Trooper Koltz approached the vehicle and asked Molina for his license and registration, which were produced. (VT 1:43:10; TR 9.) Trooper Koltz advised Molina he had been stopped for speeding and asked him to come back to the patrol car. (VT 1:43:35; TR 10.)

While writing the speeding ticket, the trooper questioned Molina about the origin, destination and purpose for his trip. (VT 1:44:50; TR 12–13.) Three minutes into the traffic stop Trooper Koltz asked if Molina was a United States citizen, if he was a resident alien, and whether he had a green card with him. (VT 1:46:13; TR 14.) [2] After some confusion at his response, Molina clarified that he did, in fact, have a green card but did not have it in his possession at the time and was in the United States legally. (VT 1:47:00; TR 57.) Trooper Koltz's questioning then turned to the passenger, Defendant Manuel Rodriguez–Arreola (hereinafter "Rodriguez"), i.e., did he speak English and did he have a green card. (VT 1:47:30.) Approximately 1:52 p.m., Trooper Koltz asked Molina to sign the speeding ticket and informed him that he would be free to leave after an exterior search of his vehicle and a radio check of his driver's license

---

1. References to the times recorded on the videotape are "VT ____". References to the transcript from the hearing are "TR ____".

2. A transcript of this videotaped exchange is attached as Appendix A.

had been completed. (VT 1:52:30; TR 16, 38–39.)

In preparation for the search of Molina's vehicle with his drug dog, Trooper Koltz asked Molina to exit the patrol vehicle and stand in the ditch. (VT 1:54:15; TR 16.) Rodriguez was then directed to step out of the vehicle where he had remained while the trooper talked to Molina in the patrol car. (VT 1:54:35; TR 16.) Trooper Koltz immediately put confrontational questions to Rodriguez, including "how well do you understand English" (when Rodriguez said "nada", the Trooper said "I'll bet you do"), "do I need to get INS on the phone," "are you a resident of this country," "where's your green card," and "you're not here legally are you." (VT 1:54:45; TR 17–18, 40–43.) These intrusive questions were put to Rodriguez within the first ten seconds of the encounter. (VT 1:54:45.) Rodriguez was then commanded to stand in the ditch with Molina. (VT 1:56:25; TR 18.)[3]

Trooper Koltz conducted an exterior search of the vehicle with his drug dog. (VT 1:57:00; TR 18.) The canine alerted to four different areas of the vehicle which prompted a search of the vehicle interior as well. (VT 1:57:49; TR 18–20.) Despite a thorough search by Trooper Koltz and his dog, no illegal drugs were located. (VT 2:11:55; TR 20, 52–53.)

After the search, Trooper Koltz ran a radio check on Rodriguez and, prior to receiving the information from the dispatcher, contacted the INS Command Center in Chicago. (VT 2:12:45–2:19:15; TR 20–21.) Because Trooper Koltz does not speak Spanish, the INS agent spoke with Rodriguez in Spanish on the telephone. (VT 2:23:10–2:25:56; TR 21–22.) The agent then advised Trooper Koltz to detain Rodriguez take him to the nearest jail facility. (TR 23.) Molina was given the speeding ticket and was informed he was free to leave. (TR 23.)

Trooper Koltz never advised Rodriguez of his Miranda rights nor was there an interpreter present during Trooper Koltz's conversations with Rodriguez. (TR. 41–42.)

## DISCUSSION

### A. Burden of Proof

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, *United States v. Phillips,* 540 F.2d 319 (8th Cir.1976) *cert. denied,* 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976), but on the government to justify a warrantless search or seizure. *United States v. Bruton,* 647 F.2d 818 (8th Cir. 1981) *cert. denied,* 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981). The standard of proof is a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The issue here is whether the officer exceeded the permissible scope of questioning in a routine traffic stop, rendering the evidence illegally seized in violation of Rodriguez's Fourth Amendment rights.

### B. The Fourth Amendment Right to be Free from Unreasonable Search and Seizure

The Fourth Amendment, of course, applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest. *Terry v. Ohio,* 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.,* 392 U.S. at 16, 88 S.Ct. at 1877. The Fourth Amendment requires the seizure to be reasonable. *United States v. Brignoni–Ponce,* 422 U.S. 873,

---

**3.** A transcript of this videotaped exchange is attached as Appendix B.

878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975).

The reasonableness of seizures that are less intrusive than a traditional arrest depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (citation omitted). To test the seizure against the Constitution one must weigh the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. *See e.g. Brignoni–Ponce*, 422 U.S. at 878–883, 95 S.Ct. at 2578–2581.

A central concern has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. *Delaware v. Prouse*, 440 U.S. 648, 654–655, 99 S.Ct. 1391, 1396–1397, 59 L.Ed.2d 660 (1979). The United States Supreme Court has recognized, in some circumstances, an officer may detain a suspect briefly for questioning although he does not have "probable cause" to make an arrest. *Terry v. Ohio*, 392 U.S. at 25–26, 88 S.Ct. at 1882. To do so, the officer must have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity. *United States v. Brignoni–Ponce*, 422 U.S. at 882–883, 95 S.Ct. at 2581. The suspicion must be more than a "hunch." *Terry v. Ohio*, 392 U.S., at 22, 88 S.Ct. at 1880. An investigation which exceeds the proper scope of the circumstances which justify a traffic stop becomes an unreasonable seizure in violation of the Fourth Amendment. *United States v. Mondragon Farias*, 43 F.Supp.2d 1276, 1281 (D.Utah 1999).

## C. *The Traffic Stop*

Rodriguez does not contend the traffic stop for speeding violated the Constitution. The Eighth Circuit Court of Appeals has repeatedly stated " 'a traffic violation— however minor—creates probable cause to stop the driver of a vehicle.' " *United States v. Barry*, 98 F.3d 373, 376 (8th Cir.1996), *cert. denied*, 519 U.S. 1140, 117 S.Ct. 1014, 136 L.Ed.2d 891 (1997). In this case, Trooper Koltz observed the speeding vehicle and had probable cause to stop it. That the initial stop was lawful cannot be disputed.

## D. *The Issues To Be Decided*

The issues to be decided are: (1) whether Trooper Koltz' immigration status questions were reasonably related to the traffic stop for speeding; (2) if not, whether there were additional suspicious circumstances which justified Trooper Koltz to expand the scope of his traffic stop investigation to include questions about immigration status; and (3) if so, should the evidence seized from Rodriguez nonetheless be suppressed.

## E. *The Proper Scope of The Traffic Stop*

■ Rodriguez argues his detention was not reasonably related, in scope or duration, to the purpose of the initial traffic stop. "Typically, a reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir.1994), *cert. denied*, 514 U.S. 1134, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995). An officer may undertake similar questioning of other vehicle occupants to verify information provided by the driver. *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir.1995),

cert. denied, 516 U.S. 936, 116 S.Ct. 348, 133 L.Ed.2d 245 (1995).

"If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir.1993). It must be remembered, however, that the initial questions asked must be "reasonably related to the stop." *Ramos*, 42 F.3d 1160, 1163 (8th Cir.1994). If *reasonably related* questions raise inconsistent answers, a trooper's suspicions may be raised, which would then enable him to expand the scope of the stop and ask additional, more intrusive questions. *Id.* If, however, "no answers are inconsistent and no objective circumstances supply the trooper with additional suspicion, the trooper should not expand the scope of the stop." *Id.*

The Government distinguishes this case from *U.S. v. Mendoza–Carrillo*, 107 F.Supp.2d 1098 (D.S.D.2000) because trooper Koltz had not yet "completed" the traffic stop when he questioned Rodriguez. In *Mendoza–Carrillo*, the court found the detention of the defendant occurred after the traffic stop was complete and there were no reasonable, articulable circumstances warranting a new detention. A careful reading of *Mendoza–Carrillo*, however, reveals the timing of the officer's questions is not the crucial issue. The *Mendoza–Carrillo* court found "the reasons offered by [the trooper] as justification for his aroused suspicion ... *were not sufficient to expand the scope of the traffic stop*, and were also not sufficient to support a new detention of Defendant." *Id.* at 1103 (emphasis added). Whether the traffic stop was complete when Rodriguez was questioned is not a pivotal issue in this case.[4] Rather, the issues are whether the immigration questions were within the proper scope of the traffic stop and, if not, whether Trooper Koltz had a reasonable, articulable suspicion which justified expanding the scope of the stop to include questions about citizenship.

The Government argues Trooper Koltz' questions to Rodriguez were proper because the purpose was to verify information received previously from Molina. The argument, however, dodges the issue. The Government has cited no cases indicating immigration questions to Molina in the first place are among those permissible in

---

4. Trooper Koltz had written the ticket and Molina had signed it, but Trooper Koltz left it on the dash of the patrol car and retained Molina's license and registration until the entire hour long encounter was over. Indeed, Trooper Koltz testified he purposely delayed delivery of the traffic ticket so he could complete his investigation. TR at 25. Trooper Koltz did not call for verification of Molina's driver's license until after the ticket was written and signed. He told Molina he was going to call the license in while he took his drug dog around the car, and then they would be free to go. Trooper Koltz spoke of an Eighth Circuit case *(U.S. v. $404,905.00 in U.S. Currency*, 182 F.3d 643 (8th Cir.1999), *cert. denied*, 528 U.S. 1161, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000)) at the suppression hearing which he believes indicates that a canine "sniff" during a routine traffic stop is not a Fourth Amendment search which requires reasonable suspicion. It is not the results of the canine sniff, however, that Rodriguez seeks to suppress. Indeed, although the dog "alerted" and "indicated," no drugs were found. Rather, Rodriguez moved to suppress information gleaned from Trooper Koltz' questioning of Molina and Rodriguez, most of which occurred before the canine sniff and all of which occurred before Trooper Koltz "concluded" the traffic stop by returning Molina's license and registration, issuing the speeding ticket, and letting Molina go on his way. The cases which draw a line at the conclusion of a traffic stop do not support the notion that officers can ask any questions they want so long as they ask before the traffic stop is ostensibly "completed."

a routine traffic stop, and no persuasive authority has been found that they are.

Over fifteen years ago, the United States Supreme Court decided that "[e]xcept at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 876, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). The Court held the stop in *Brignoni-Ponce* was unlawful because the officers "relied on a single factor to justify stopping [the] car: the apparent Mexican ancestry of the occupants." *Id.*, 422 U.S. at 885, 95 S.Ct. at 2582.

Other courts have noted that questioning about country of origin or immigration status during a routine traffic stop is generally inappropriate. A district court in New York was faced with a situation somewhat similar to this in *United States v. Restrepo*, 890 F.Supp. 180 (E.D.N.Y.1995). In that case, the Hispanic defendants were ostensibly stopped for speeding. The officer's questions, however, far exceeded those permissible during a routine traffic stop. The court granted the motion to suppress, noting,

> One can imagine a situation in which an officer issuing a warning or a ticket in connection with a routine traffic stop observes something that creates a reasonable suspicion of additional wrongdoing. In that hypothetical situation, an officer would be justified in detaining a suspect as necessary to dispel or resolve his or her concerns.
>
> That was not the case here. Under an objective evaluation of the facts known to and observations made by the first officer at the time of the stop as it progressed, except for the invidious ones of ethnicity and out-of-state vehicle reg-

istration, it is apparent that he lacked a reasonable articulable suspicion of wrongdoing necessary to continue holding Guevaras beyond the issuance of a warning.

> The first officer was determined to elicit something incriminating from the Guevaras from the moment that he saw their car ... The stopping officer stalled in issuing the warning to assure that the Guevaras would still be present when a back-up officer arrived. His hope was to elicit incriminating statements which would justify a further detention and search. Unnecessarily prolonging a traffic stop for the purpose of eliciting information about a suspected unconnected violation for which there is no objective basis is not acceptable.
>
> * * *
>
> First, it is apparent that the first officer's questioning of Guevara exceeded the scope of what is justifiable for a routine traffic stop. He did not limit his questions to requests for Guevara's driver's license and registration, or even to the nature and purpose of his trip. The questioning extended to issues unrelated to the alleged traffic offense of speeding. For example, he apparently inquired into Guevara's country of origin, just as the second officer later noted that [sic] of Mrs. Guevara.

*Id.* at 195.

Similar unacceptably broad questioning was the subject in *United States v. Pruitt*, 174 F.3d 1215 (11th Cir.1999) *cert. denied*, 528 U.S. 1023, 120 S.Ct. 535, 145 L.Ed.2d 414 (1999). There, the defendant was stopped for speeding and the officer ultimately searched the vehicle and found marijuana. The district court, however, found the officer's questions exceeded the permissible scope of a routine traffic stop. "In such circumstances, additional 'fishing expedition' questions such as 'what do you

do for a living?' and 'how much money did your van cost?' are simply irrelevant, and constitute a violation of Terry." *Id.* at 1219. The court watched the videotape and concluded the officer was acting on an unsupported hunch instead of a reasonable suspicion the defendants (both of whom had Hispanic sounding names) had broken anything other than the speeding laws. *Id.* "This appears to be yet another case in which a driver, once stopped, is unreasonably detained because of his/her race or national origin ..." *Id.* This Court is left with a similar impression after watching the video in this case.

The constitutionality of immigration questions during a traffic stop was likewise examined in *Farm Labor Organizing Committee v. Ohio State Highway Patrol,* 991 F.Supp. 895 (D.Ohio 1997). There, the court noted that highway patrol officers "can, at least in some circumstances, question motorists about their alienage and immigration status." *Id.* at 903. However, er,

> [t]he constitutionality of such questions to motor vehicle occupants and drivers depends on the second Terry inquiry: namely, whether such investigation is "reasonably related in scope to the justification for its initiation" or "reasonably designed" to meet the objectives which justified the interference in the first place.
>
> In the context of this case, this means that the intrusiveness (i.e. questions about alienage or immigration status) and duration of the stop must bear a reasonable relation to either the underlying traffic offense or other circumstances that come lawfully to the officer's attention during the stop.

*Id.* In that case, as here, the reason for the initial stop was a traffic violation. "An inquiry by the [highway patrol] as to an individual's immigration status cannot be 'reasonably designed' to meet the objec-

tives of a traffic stop or 'strictly tied to and justified by' the circumstances that led to the stop and ensuing seizure." *Id.* The court also noted there had been no showing the officer had a reasonable suspicion, aside from the driver's Hispanic appearance, to believe he may have been an alien. Trooper Koltz offered several observations as justification for his suspicion Molina and Rodriguez were engaged in criminal activity (and thus for expanding the scope of the traffic stop). Whether those observations created a reasonable suspicion to expand the scope of the stop and whether such an expanded scope included immigration questions are discussed below. It is clear, however, that immigration questions are not permissible during a routine traffic stop in the absence of a reasonable, articulable suspicion warranting an extension of its scope.

### F. Whether Trooper Koltz Had A Reasonable, Articulable Suspicion Which Justified Expanding the Scope of the Traffic Stop.

■ Unless Trooper Koltz had a "reasonable, articulable suspicion" that criminal activity was afoot, neither a new detention nor an expansion of the scope of the traffic stop was proper. *United States v. Mendoza–Carrillo,* 107 F.Supp.2d 1098, 1103 (D.S.D.2000). The question is whether Trooper Koltz was aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime was being committed. *United States v. Beck,* 140 F.3d 1129, 1136 (8th Cir.1998). "The totality of the circumstances-the whole picture-must be taken into account." *Id.* (citation omitted). The courts can consider any added meaning certain conduct might suggest to experienced officers trained in crime detection and observation and familiar with operating modes of criminals. *Id.* Finally, "[t]he officers must be

acting on facts directly relating to the suspect or the suspect's conduct and not just on a hunch or on circumstances which describe a very broad category of predominantly innocent travelers." *Id.* (citation omitted). Trooper Koltz testified the following made him suspicious that criminal activity was afoot: (1) Molina and Rodriguez appeared nervous and did not make eye contact; (2) the car was very clean on the inside and had no luggage in it; and (3) their car had Washington plates. Trooper Koltz' stated these circumstances led him to believe Molina and Rodriguez were either (1) in possession of illegal drugs or (2) in the country illegally. As explained below, these reasons are insufficient to create a reasonable articulable suspicion to expand the scope of the traffic stop investigation.

The mere failure to make eye contact with Trooper Koltz does not provide reasonable suspicion. *United States v. Mendoza–Carrillo,* 107 F.Supp.2d 1098, 1102 (D.S.D.2000). As one district court recently noted:

> The failure to make eye contact cannot weigh in the balance in any way whatsoever ... Avoidance of eye contact is entitled to no weight ... Reasonable suspicion should not turn on ... ophthalmological reactions ... [T]to allow this to be a factor would put the officers in a classic heads I win, tails you lose position. The driver, of course, can only lose.... Because the preponderant view is that eye contact cannot be considered as a factor, the Court will accord it no weight.

*United States v. Rubio–Hernandez,* 39 F.Supp.2d 808, 818 (W.D.Tex.1999) (citations omitted). Likewise, that Molina and Rodriguez appeared to be nervous does not create reasonable suspicion. "It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." *United States v. Beck,* 140 F.3d at 1138. "That nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on nervousness ... as a basis for reasonable suspicion ... must be treated with caution." *Id.* (citations omitted). Trooper Koltz stated nervousness usually subsides once a person knows why he was stopped, but Molina and Rodriguez appeared nervous throughout the entire stop. Trooper Koltz told Molina to come sit in the patrol car immediately after revealing the reason for the stop. Trooper Koltz' drug dog (which resembles a German Shepard and weighs ninety-six pounds) was in the back seat barking intermittently throughout the conversations with both Molina and Rodriguez. It is certainly possible, if not likely, that the presence of a large, barking dog would make many people nervous, whether the guilt of a recently committed crime was on their conscience or not.[5] One can also imagine that innocent Hispanic people with limited command of the English language would quite naturally be nervous during an encounter with police because they fear being presumed guilty of criminal activity for the very reasons of their Hispanic appearance, limited command of English, and out of state license plates. That Molina and Rodriguez continued to appear nervous after learning the reason for the stop did not create reasonable suspicion that criminal activity was afoot.

The absence of luggage or trash in the passenger compartment is also insufficient. (Trooper Koltz conceded there were two pieces of luggage in the trunk). "Because it is eminently reasonable to store luggage in the trunk of an automobile when travel-

---

**5.** Interestingly, at a recent, unrelated preliminary hearing, a DEA agent testified dogs made the police nervous while a search warrant was being executed.

ing, we think that this circumstance fails to generate any suspicion of criminal activity. Indeed, motorists are specifically advised by law enforcement agencies, as a crime prevention tip, not to leave their luggage in view." *United States v. Beck,* 140 F.3d at 1138. Trooper Koltz offered no explanation why the cleanliness of the vehicle (no soda cans or debris) made him suspect criminal activity was afoot. In *Beck,* one of the reasons offered by the officer was the *presence* of fast-food trash. The Eighth Circuit, however, attached no significance to the observation and noted the officer offered no basis for his supposition that the existence of fast-food trash was an identifier of drug trafficking activity. The appeals court noted the district court judge in *Beck* admitted to occasionally having fast food trash in his own vehicle. Likewise, there is no basis for the supposition that the non-existence of soda cans or debris is an identifier for drug traffickers or illegal aliens. Indeed, this Judge must admit he has been known to travel in a clean vehicle on occasion.

Finally, that the vehicle had out-of-state plates does not create reasonable suspicion. Trooper Koltz testified that Washington is a known "source" state for illegal drugs. However, the Eighth Circuit has rejected this argument in *Beck.* "This court has previously held that out-of-state plates are consistent with innocent behavior and not probative of reasonable suspicion." *Beck,* 140 F.3d at 1137. "We do not think that the entire state of California, the most populous state in the union, can properly be deemed a source of illegal narcotics such that mere residency in that state constitutes a factor supporting reasonable suspicion." *Id.* Washington is not the most populous state in the union, but the same logic applies. *See also United States v. Pruitt,* 174 F.3d 1215 (11th Cir. 1999) *cert. denied,* 528 U.S. 1023, 120 S.Ct. 535, 145 L.Ed.2d 414 (1999).

Neither do all of these observations, taken together, constitute a reasonable suspicion that criminal activity was afoot. In *United States v. Tapia,* 912 F.2d 1367 (11th Cir.1990), the Eleventh Circuit found that a nearly identical set of circumstances was not enough to justify further detention after a traffic stop.

> Nevertheless, we find that the factors cited by the district court in this case, e.g. being Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates (not yet a crime in Alabama), do not provide a minimal, particularized basis for a conclusion of reasonable suspicion on the part of [the officer]. Even when considered together and in light of all the facts, such observations fail to suggest that an appellant and his brother were engaged in any criminal activity other than speeding on the highway.

*Id.* at 1370. Thus, neither an extension of the original traffic stop nor a further detention were justified.

This brings us to the canine sniff. In *United States v.$404,905.00 in U.S. Currency,* 182 F.3d 643 (8th Cir.1999) *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000), the Eighth Circuit decided reasonable suspicion is not required to subject a vehicle to an exterior canine sniff. Here, Officer Koltz' dog "alerted" to four areas of the car, and "indicated" to one. An "alert" gives the officer probable cause to search without a warrant. *Id.* at 646. Officer Koltz however, asked both Molina and Rodriguez about their immigration status, and took possession of both of their ID cards *before* the canine sniff. The illegal seizure had already taken place, and any further, post-canine sniff questioning about immigration status was in follow-up to the earlier inqui-

ries. In other words, by the time the canine sniff justified expansion of the traffic stop, the poisonous fruit had already fallen from the tree.

■ Additionally, even if, *arguendo*, Trooper Koltz' observations and/or the canine sniff were sufficient to raise a reasonable suspicion about possession of illegal drugs, it does not follow there is also reasonable suspicion of illegal alien status. *See Farm Labor Organizing Committee v. Ohio State Patrol*, 95 F.Supp.2d 723, 736 (N.D.Ohio 2000). In that case, the court aptly noted,

> [the highway patrol] argue that the seizure of Aguilar's and Esparza's immigration documents can be explained by the "alert" of a drug sniffing dog immediately before their documents were taken from them. But the potential presence of drugs in a motorist's car says nothing about the likelihood that the motorist is an illegal immigrant ... If there is no such correlation, the alert cannot justify questions about immigration. Yet, beyond the dog alert, defendants have articulated no reason why Aguilar and Esparza were asked for their green cards.

*Id.* The "positive" canine sniff, therefore, could justify questions about drugs, but cannot be used to justify further questioning of Rodriguez about his immigration status, even if it were possible to rid the post-canine sniff questions of the taint from the previous illegal seizure.

The Government argues Trooper Koltz' incriminating questions to Rodriguez were appropriate because they were asked to verify information provided by Molina (namely, that Rodriguez was in the country illegally). The Government's argument misses the point: Trooper Koltz' question to Molina about Rodriguez' immigration status was neither within the proper scope of routine traffic stop questions, nor was it prompted by any reasonable, articulable suspicion that Rodriguez was an illegal alien. A similar argument was made in *Restrepo*, 890 F.Supp. 180, 195, but the district court stated, "[t]he 'discrepancies' in the answers supplied by Mr. And Mrs. Guevara could not be relied upon to justify the duration and scope of the detention. The questioning of Mrs. Guevara occurred far into the detention-when its proper scope had already been exceeded-so any 'discrepancies' could not be used as a justification for extending the stop." *Id.* The same is true here,[6] except that here, there were no inconsistencies between the answers of Molina and Rodriguez.

Trooper Koltz took Rodriguez to his patrol car for the purpose of learning his identity and immigration status, not for the purpose of verifying any information gleaned from Molina concerning the speeding violation. The investigation of the speeding violation was complete and a ticket had been written and signed (although not given to Molina) at the time Trooper Koltz began questioning the Rodriguez. Trooper Koltz did not even ask Molina what his passenger's name was, only whether the passenger had a green card.

---

**6.** Trooper Koltz may have eventually determined Rodriguez was an illegal alien by following up on acceptable routine traffic stop questions. For example, if Molina had given inconsistent responses to inquiries about his passenger's name, or if Molina gave a false name for Rodriguez and Rodriguez either gave a different name or his identification card did not show the same name or appeared to be counterfeit, Trooper Koltz may have been justified in further questioning about Rodriguez' identity and perhaps his immigration status. Rather than pursuing his suspicions through a legitimate route, however, Trooper Koltz almost immediately undertook an impermissible line of questioning about Molina and Rodriguez' immigration status. In fact, Trooper Koltz never even asked Molina his passenger's name-only whether he had a green card.

As explained above, Trooper Koltz' questions to the driver regarding his and his passenger's immigration status were beyond the permissible scope of questioning for this routine traffic stop and beyond the scope of any expanded investigation for drug possession. Thus, there was no properly obtained information given by Molina to Trooper Koltz that was the proper subject of verification by Rodriguez. Mr. Rodriguez was illegally seized when he was questioned about his immigration status. It is recommended, therefore, that the Motion to Suppress be granted.

### G. *Whether Rodriguez Should Have Received His Miranda Rights*

The information gleaned from Rodriguez about his immigration status [7] must be suppressed because it was obtained as a result of an illegal Fourth Amendment seizure. The Fourth Amendment issue notwithstanding, there is another, independent reason Rodriguez' statements should be suppressed: He was never "Mirandized."

In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the United States Supreme Court considered whether the roadside questioning of a motorist detained pursuant to a routine traffic stop is "custodial interrogation" thus triggering the requirement for a Miranda warning. The Government in *Berkemer* urged the Court to never require Miranda warnings following a routine traffic stop. The defendant urged the Court to always require Miranda warnings prior to roadside questioning pursuant to a traffic stop. The Court chose neither option. The Court decided that, as a *general rule*, Miranda warnings are not required during traffic stop questioning:

Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced "to speak where he would not otherwise do so freely." First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect questioning incident to an ordinary traffic stop is quite different from station-house interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.

Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police ... In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in Miranda itself.

*Id.*, 468 U.S. at 438, 104 S.Ct. at 3149 (citations and footnotes omitted). The Court explained that, usually, traffic stops are "noncoercive" and therefore the people detained pursuant to traffic stops are not "in custody" for purposes of Miranda. *Id.* The Court stopped short, however, of deciding Miranda warnings are never required during traffic stop

---

**7.** Exactly what will be suppressed is discussed in the final section of this Report and Recommendation.

questioning. It noted the defendant's argument that to exempt' traffic stops from the coverage of Miranda would open the way to widespread abuse where policemen would simply delay formally arresting detained motorists, and would subject them to sustained and intimidating interrogation at the scene of their initial detention. The Court stated,

We are confident that the state of affairs projected by the respondent will not come to pass. It is settled that the safeguards prescribed by Miranda become applicable as soon as the suspect's freedom of action is curtailed to a "degree associated with formal arrest." If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda.

*Id.*, 468 U.S. at 440, 104 S.Ct. at 3150. This is one of those cases. "A suspect is in custody for purposes of Miranda when he is arrested or when he is 'deprived of his freedom of action in any significant way.'" *United States v. Johnson*, 64 F.3d 1120, 1124 (8th Cir.1995) *cert. denied*, 516 U.S. 1139, 116 S.Ct. 971, 133 L.Ed.2d 891 (1996). A suspect is considered "in custody" for Miranda purposes either when he has been formally arrested and is not free to leave the location, or when a reasonable person in the suspect's position would have considered his freedom of movement restrained to a degree that is usually associated with a formal arrest. *United States v. Arango–Chairez*, 875 F.Supp. 609, 614 (D.Neb.1994), *aff'd*, 66 F.3d 330 (8th Cir. 1995). Whether a suspect is in custody is determined by considering whether a reasonable person in his position would have understood the nature of his situation. *Johnson*, 64 F.3d at 1124.

Miranda warnings are not necessary during ordinary Terry stops because they generally do not amount to custodial interrogation ... Factors useful in considering whether custody is involved are whether the suspect was advised that he was free to go, whether he was restrained, whether he initiated contact with authorities, whether strong arm tactics or deceptive strategems were used, whether the atmosphere was police dominated, and whether the suspect was placed under arrest at the termination of questioning.

*Id.* (citations omitted).

The relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151. Rodriguez was never advised he was free to go. He waited in his friend's (Molina's) car while Molina talked to Trooper Koltz in the patrol car. Rodriguez watched the Trooper order Molina to stand in front of the car in the ditch. The Trooper opened the car door and motioned for Rodriguez to get out. Rodriguez was immediately met with a series of extremely accusatory, confrontational questions from Trooper Koltz. Trooper Koltz never explained what was going on, or that Rodriguez would be free to go at any point. Instead, Trooper Koltz said "do I need to get INS on the phone?" followed by "is that how we are going to play it?" The Trooper's fourth question ·to Rodriguez "are you a legal resident of this country?" elicited an incriminating response.

Rodriguez was a passenger in the car, not the driver. The car was stopped on the interstate in a rural area. Rodriguez watched his friend (the driver of the car and thus his only means of leaving the scene) questioned and then ordered to stand in the ditch, and he surely knew he was next. He was confronted by a uniformed, armed Trooper with a drug dog who did not believe him when he said he did not speak English and who, only sec-

onds into their conversation, threatened to call INS. After the first series of incriminating questions, the Trooper told Rodriguez to stand in the ditch with his friend, and then proceeded to run the drug dog around the car. Rodriguez watched as. Trooper Koltz performed a very thorough search of the car (including rifling through the luggage in the trunk and inspecting the engine compartment). The Trooper took Rodriguez back to the patrol car after the search, where more incriminating questions were asked, together with an incriminating telephone conversation in Spanish with an INS agent. All the while, Rodriguez was in the front seat of the patrol car, the drug dog barked in the back, and his friend was still in the ditch. He was not free to leave at any stage of this encounter, and no reasonable person in his situation would have thought otherwise. At the end of the incident (about an hour after Molina's car was pulled over) Rodriguez was driven to the county jail in Sioux Falls, where he was incarcerated while waiting to be formally arrested by the INS. His friend Molina was permitted to leave the scene and go on his way.

In *United States v. Perdue*, 8 F.3d 1455 (10th Cir.1993), the court decided, in that instance, Miranda warnings were necessary for an individual questioned pursuant to a Terry stop. The circumstances in *Perdue* were quite different from this case, but the court noted "an encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent." *Id.* at 1461. "Probable cause requires 'only probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. Neumann*, 183 F.3d 753, 755 (8th Cir.1999), *cert. denied*, 528 U.S. 981, 120 S.Ct. 438, 145 L.Ed.2d 342 (1999) (citations omitted). The level of suspicion for a probable cause finding is more demanding than the "reasonable suspicion" required

for a Terry stop. *United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir.2000). It follows, then, that if there was no reasonable suspicion to justify expansion of the traffic stop, there likewise was no probable cause to do so. Therefore, Trooper Koltz' questions regarding immigration status were constitutionally justified only if Rodriguez consented to them. Rodriguez, however, was not given a choice.

■ As explained above, Rodriguez was "in custody" when he was questioned about his immigration status. The next question is whether Trooper Koltz' questions rose to the level of an "interrogation," thus triggering the need for a Miranda warning. An interrogation includes "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted).

As a general rule, routine biographical data is exempted from Miranda's coverage. *United States v. Brown*, 101 F.3d 1272, 1273 (8th Cir.1996).

> A request for routine information necessary for basic identification purposes is not interrogation under Miranda, even if the information turns out to be incriminating. Only if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the question be subject to scrutiny.

*Id.* When the government agent suspects the person of being in the country illegally, his identity is in fact "directly relevant to the substantive offense." Trooper Koltz testified he suspected Rodriguez was in the country illegally. He cannot therefore claim the information he sought merely

"turned out" to be incriminating. Rather, he was reasonably aware the questions he was asking were directly relevant to the crime he believed had been committed.

The First Circuit examined the "biographical exception" to Miranda in *United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir.1989). There, the defendants were asked questions about their identity and citizenship without being Mirandized, when citizenship was an essential element of the potential charge against them. "The cases that create [the biographical information] exception, however, note that it does not apply where the law enforcement officer, under the guise of asking for background information, seeks to elicit information that may incriminate." *Id.* at 1551. Trooper Koltz, although acting on what amounted to nothing more than a "hunch," suspected Molina and Rodriguez were illegal aliens. It turns out his hunch about Rodriguez may have been correct (but it was wrong regarding Molina). Because he believed both men to be illegal aliens, Trooper Koltz fully expected his questions to lead to incriminating answers. That Rodriguez never received his Miranda rights, therefore, provides an independent basis to grant his Motion to Suppress.

## H. *Suppression of Identity*

The Government argues even if the detention was illegal, Rodriguez' "identity" should not be suppressed. The Government specifically mentions his fingerprints and ID card, and argues the constitutional violations do not mandate they be suppressed. Rodriguez, on the other hand, requests "any and all" evidence and statements obtained as a result of the illegal

detention be suppressed. Trooper Koltz obtained Rodriguez' ID card from him in response to his request for a green card.[8] Trooper Koltz asked for Rodriguez' green card because of Molina's earlier response to the direct inquiry about Rodriguez' immigration status. Trooper Koltz never asked Molina or Rodriguez for Rodriguez' name, and did not learn Rodriguez' identity until he asked for the green card. Fingerprints, if they were obtained, were obviously taken after the traffic stop and as a result of the illegal seizure of Rodriguez. While Trooper Koltz' might have obtained information about Rodriguez' identity during the normal, permissible course of the traffic stop, he chose not to, in his own words, "play it that way." TR 43, VT 1:54. As a result, all information he gathered about Rodriguez' identity is "fruit of the poisonous tree" and will be suppressed.

The Government argues Rodriguez' "identity" (i.e. his ID card, statement of his name, and fingerprints) should not be suppressed even if they were obtained as a result of constitutional violations. This District Court has already rejected that contention in *United States v. Mendoza–Carrillo*, 107 F.Supp.2d 1098 (D.S.D.2000). In that case, Judge Piersol stated:

[t]he INS must have a way to combat illegal re-entry. However, giving law-enforcement officials an incentive to discover a person's identity in whatever way they can puts the privacy rights of legal aliens and any citizen that might for any reason be suspected of illegal entry at too great a risk. In addition, the suppression of the defendant's statement of his identity will not hamper the INS in civil deportation proceedings.

8. This case is therefore unlike *United States v. Johnson*, 58 F.3d 356 (8th Cir.1995) *cert. denied*, 516 U.S. 936, 116 S.Ct. 348, 133 L.Ed.2d 245 (1995). In that case, a routine check of the driver's license revealed he could only drive in the presence of another licensed driver. His passenger's license, therefore, was requested. In *Johnson*, the request for the passenger's ID was a valid follow-up to acceptable, routine questions of the driver. Here, the ID was obtained as a result of a series of unacceptable, non-routine questions.

*Id.* at 1106. It is recommended, therefore, that all evidence resulting from Rodriguez' illegal detention, including his statement of his identity, his ID card, and his finger-prints be suppressed.

## CONCLUSION

Based upon the record before me I conclude that the United States has failed to carry its burden of proof. It is therefore my Report and Recommendation that the Defendant's Motion to Suppress all evidence and statements obtained from defendant (Doc. 12) be **GRANTED.**

## NOTICE TO PARTIES

Any objection to this report and recommendation must be served and filed within ten days of the date of service of this notice upon you. 28 U.S.C. § 636(b)(1)(C). If no objections are filed, the district court may adopt, reject, or modify this report and recommendation.

Dated at Sioux Falls, South Dakota, this 21st day of November, 2000.